Council, before we get started we have an order which indicated the sequence of proceeding. We will allow each side 20 minutes and then each side will have five additional minutes for rebuttal only. Thank you, Your Honor. You may proceed to the court. Sean Hood on behalf of Freeport Minerals Corporation. In terms of our 20 minute allocation on our side, I have 15 minutes. Mr. Eckstein will follow with five and I'll do my best to keep track on that. While Freeport cross-appeals certain rulings of the district court below, for the most part the reason that we're here, the district court requested this court affirm Judge Bolton with respect to her determinations on forfeiture and for the most part abandonment. We'll talk about something where we don't agree with what she did on abandonment, but by and large we think she got the law right. The importance of these issues of forfeiture and abandonment extend well beyond the three remaining applications that we're here to talk about today. First, we believe that Judge Bolton's forfeiture analysis should be affirmed in all respects. A different outcome would be inconsistent with this court's prior precedents, under an analytically identical savings clause in Nevada, and it would also carry dire consequences for water users throughout Arizona. On the second point, again Judge Bolton's abandonment rulings follow the most part. There's one area where we don't believe she actually evaluated Freeport's evidence of intent with respect to the 1.4 acres. Counsel, you have one problem, do you not, and that's San Carlos Apache trap throughout the Arizona Supreme Court case? No, Your Honor. I'm prepared to discuss San Carlos at length. It is the case that the objectors rely on so heavily, and San Carlos... It's probably incumbent on you to respond. I'm certainly prepared to do that, Your Honor, and Judge Bolton had it exactly right. The Arizona Supreme Court in San Carlos did not reach the question about whether forfeiture applies to pre-1919 rights. It simply did not reach that question. Judge Bolton had that exactly right, and when you take a step back and look at the proceedings there, and Judge Bolton, it's an interesting coincidence she was the trial court judge in that special action. That special action was initiated to Arizona's Water Code, and both Judge Bolton at the trial level and the Arizona Supreme Court on review took a two-step process in analyzing the constitutionality of those amendments. Number one, are these amendments intended to be applied retroactively? Very clearly, based upon the plain language of the amendments, they were intended to be applied retroactively. So the next step is, is the amendment merely procedural, or does it affect substantive rights? If the former, it may pass constitutional muster. If it is intended to affect substantive rights, that is a violation of due process. Neither court reached the issue about whether any particular amendment actually affected a change in existing law. It simply did not reach the issue. And this is clear on the face of Judge Bolton's order. She says that issue will have to be reached when represented with a particular case of controversy. And she said, if, in fact, the parties arguing various reasons why the amendments were constitutional, one of those grounds was, we're not really changing the law here, we're simply codifying it or clarifying it. She said when presented with a particular case of controversy, it may be the fact that the amendment is merely restating the existing common law. However, did not reach that question. In terms of the Supreme Court's analysis, very clearly, when you look at paragraph 17 of the San Carlos decision, that is the sum total of the analysis related to the amendments to the forfeiture provision. And that forfeiture provision is ARS section 45-141E. Two or three sentences, absolutely no analysis about whether forfeiture applies to pre-1919 rights, no discussion of Arizona Savings Clause, which is analytically identical to the And, Your Honor's Judge Gould, the paragraph that really underscores what the Arizona Supreme Court was doing and what it was not doing, namely, was not reaching the question about whether these amendments were a change in the law. Two paragraphs later, paragraph 19, and here, the Arizona Supreme Court evaluated an amendment to section 45-162B. And the issue there was, does it delay by the process and processing application to appropriate have any impact on the priority date? And the Arizona Supreme Court observed, we don't think that changes anything. We think the date of filing is your priority date under existing law. The amendment doesn't change that. Maybe reinforces that. The court did not reach the question and struck down the amendment, even though it observed, in all likelihood, it was not a change in the law. So again, the Arizona Supreme Court did not reach the question. Judge Bolton did not reach the question. And her analysis in this case is absolutely correct. We have a Nevada Savings Clause construed by this Court on multiple occasions that is analytically indistinct from Arizona Savings Clause. No objector takes the position that there is any meaningful distinction in the language of those savings clauses. So there's no reason to deviate. The Arizona Supreme Court did not reach that issue. So the actual relevant cases here, in terms of what that savings clause means, the In Re Manspray from the Nevada Supreme Court, where you have a two-degree court that actually did evaluate the meaning of the savings clause, and then this Court's precedence. You have In Re Ore Water Ditch, or not In Re, Ore Water Ditch, expressly evaluating the meaning of the very words that are functionally identical to those Arizona, and the meaning of those words, the reason that the legislature put those into the Act in the 19-teens was to ensure that pre-existing water rights would not be impaired. A water right that previously is not subject to forfeiture and now is, is something less than it once was. And that is the reason for these savings clauses. That is the analysis of this Court in Ore Water Ditch, and at least three of the Alpine cases, Alpine 3, Alpine 6, Alpine 7, and In Re Mans. So Judge Bolton had that exactly right. The Arizona Supreme Court in San Carlos struck down a variety of amendments, many of which probably don't really change Arizona law. However, they were new amendments, new language grafted onto these statutes, literally entitled to be applied retroactively, and because they affected substantive rights, that is a due process violation. The Court did not reach the question about whether it was a change in law. What's your position about, even though it doesn't apply to pre-1919 law, that going forward, that the law would apply? In other words, just the normal law. If you don't use it, you forfeit it. Judge Smith, if I understand your question, you're asking, why is it even, even if the savings clause applies to pre-1919 water rights, why does that impact occurrences after 1919? Right. Okay. Well, I'm glad I'm not relying on Third Circuit law. I'm relying on your Circuit's law, Your Honor. The meaning of these savings clauses, when it says, not impair a vested water right, again, a water right in 1910, when someone goes out and appropriates a water right, it's not subject to forfeiture. If in 1925, he is unable to make use of water for some reason, that water right is not the same. It is impaired. It is not the same as it once was, and this Court has made that same reasoning with respect to Nevada savings. On which case? Poor ditch? Poor water ditch, as well as at least one of those three Alpine cases addressing that issue. And clearly, Henry Madden Spring goes through that in great detail, and that's the Nevada Supreme Court case. I don't want to move on to abandonment if you have more questions about forfeiture, because this is the big one from our perspective, and I think from everybody's perspective. Counsel, let me just throw in a curve ball here. Do we have jurisdiction on this case? Yeah. Just in very brief, I think you're going to hear more about jurisdiction than the others, frankly. Freeport's position very clearly, Judge Bolton, entered a final order in this case, and I don't think any party who is going to be speaking with you today disagrees that Freeport's applications are private before this Court. I guess my question is, do we have jurisdiction over all of the appeals and all of the parties? And I'm wondering why there's no 54B certification. You're going to hear from Mr. Eckstein his view on some of his client's applications, and Freeport, frankly, doesn't weigh in on that, doesn't take a position. Oh, okay. But certainly as it relates to Freeport's applications, they are all before you, and I think every counsel who you hear from will agree on that point. All right. We'll ask Mr. Eckstein. Right. Go ahead. Hearing no further questions on forfeiture, I'll turn to abandonment. The District Court correctly determined that Freeport had no intent to abandon its lands that had been overtaken by the Gila River during very significant flooding events, and one of these occurred circa 1991, and that's the date that kept coming up in many of her discussions. Here, the District Court made a factual finding based upon the evidence in the record of actual intent, and so the objector's burden here with respect to these river bottom lands is to demonstrate to you that Judge Bolton's determination is clear of error, and this they cannot do. The objector's only evidence at the trial court level was a prologue to non-use of the decreeed parcel, and that, of course, was a function of the river moving, not anything the farmer did. Well, with respect to that, perhaps this is new. As I understand it, Issues 115, 147, and 151 have all been withdrawn. Am I wrong on that? That is correct. So this is a move issue. There are forfeiture issues. I'm talking about abandonment. You're right. I believe that some of the applications that are preserved that were not part of the 10 test cases, and there hasn't been full discovery on those, but I believe that some of those applications do involve lands that are river bottom, and the objections to those were withdrawn subject to this appeal. And so, essentially, I know it's complicated. We were here with you five years ago, as you recall. There was cooperation with the objectors to try and do this in a way that would make sense, and what the parties agreed to was withdrawal of the objections. Let's get all of this in front of the court in an orderly fashion. So there are applications, and perhaps not the three that were test cases that remain. There are applications. How do we deal with the applications that are in front of this court? All of Freeport's 59 applications are before this court. Do you argue even those that were withdrawn? Several of them were deemed denied for the reasons set forth in the 2010 Freeport order. That's the seven? No, that extends beyond the seven. Oh, all right, all right, correct. The 49? Correct. Okay, the 49. So that's off on one side. The focus was on the 10. As I understand it, three of those have been withdrawn. Am I wrong? Other way around. In fact, there's three remaining. Seven were withdrawn because those lands ended up being included in covenants not to irrigate down the line. So I know it's very complicated. Should I change my thought? According to my notes, Freeport conceded in its opening brief that application 147 is, in quotes, now moot and not subject to this appeal as to the red brief at 25. And also application 151 is also moot, not subject to the appeal, that's red brief, and also at 25. Do you agree with that? I agree that what you're reading is correct. We filed a notice of errata just earlier this week. As I was preparing for this, I realized that application 147 is actually not among those lands subject to the covenants not to irrigate. So application 147, it's not moot in that sense. We're not coming in here today to appeal for denial of that application. I don't think that would have been fair. So you don't have jurisdiction over it is what you're saying? You do have jurisdiction over that application. And certainly the abandonment issue on the 1.4 acres, that relates to application 147. 2008, that's 147. So it is before you. We are not requesting reversal of the denial on that application. Because in our opening brief, we said we weren't going to do that. Too late in the game, from my perspective, to change that. So it is before you, Your Honor. The abandonment ruling is before you. And it's not mooted in the sense that there's been some waiver of the rights on that land. That clarification was made earlier this week. So turning back to evidence of intent, with respect to the river bottom lands, again, the only evidence of an intent to abandon was the prolonged period of not use. And that's because the fields were rendered non-irrigable by movement of the river, through no fault of the farmer, the irrigator, the decreed right holder. The court properly weighed that one piece of evidence against several pieces of evidence that clearly demonstrated Freeport's intent to maintain its water right and not abandon it. And that includes the fact that Freeport acquired these farms for the sole purpose of acquiring their impertinent decreed water rights. Freeport paid all of its water assessments, maintained all of its ditches and roads, and paid all operation costs. So this was a factual finding following the law of abandonment, which, again, happens to be very similar in Arizona and Nevada. You're supposed to look at all surrounding circumstances. She did that. She determined that the objectors had not demonstrated an intent to abandon. And that covers all of the river bottom lands. And, again, so that one is a clear error standard, and the objectors can't beat that. The one disagreement that Freeport has, it comes back to Application 147. And here what seems to have happened is Judge Bolt looked at this court's determinations in the Alpine line of cases. Perfectly appropriate. She gleaned a lot of guidance from those cases. Again, perfectly appropriate. The problem that we have with this one particular parcel is Judge Bolton applied essentially a legal standard that she derived from Alpine 4, and she only looked at three pieces of evidence. And here the only things that Judge Bolton looked at was a prolonged period of non-use, an improvement inconsistent with agriculture. There was a farm road constructed, apparently in connection with the river moving, so that there was access to the remaining irrigable lands. And then a delay in filing server and transfer applications. Now, those three facts are relevant. Certainly no problem with her taking a look at those. The problem is while those were the three relevant facts in Alpine 4, those were but a subset of the relevant facts related to Freeport's applications and its intent. And so what is very clear when you look at pages 48 and 49 of her order on the Freeport applications, she did not look at the other evidence, the countervailing evidence on the other side of the ledger demonstrating that Freeport did not have an intent. She found many of those facts elsewhere in her opinion, but if you look really closely at exactly what she did in determining that these 1.4 acres were abandoned, she looked at those three facts and none other. And so the other ones that needed to be looked at, there's two periods of time here. So, yes, there was a farm road, and there was a prolonged period of non-use, and the server and transfer application was not filed until 2008. Again, perfectly fine to look at those facts. They are relevant. However, what also needs to be looked at, from 1991 when the river moved through 1997, every decreed right holder received the full allocation of his, her, or its water rights at all times, even if that irrigator was cultivating somewhat less than its full decreed acreage. And that was a practice dating all the way back to 1935 when the decree was entered, a practice administered by an officer of the court, the water commissioner. And there can be no inference of intent to abandon when someone is actually making use of the water on decreed lands. I know you wanted to focus exclusively on the forfeiture and abandonment issues, but because this involves Freeport in a major way, I wonder if you could just comment briefly on whether the district court heard on its determination that your client failed to fulfill its burden to present a prime infatuation case, demonstrating that its server and transfer applications would not injure the rights of other decreed parties. In terms of ranking a priority, forfeiture one, abandonment two, and the prime infatuation issue is my third issue, Your Honor. I'm happy to address that. I don't even know we have time, but we have time to talk about it. That's an important issue. I will certainly do my best. So the issue here is what is the meaning of an initial prime infatuation burden? An initial prime infatuation burden does not require proof beyond a reasonable doubt. It does not require clear and convincing evidence. All a prime infatuation burden requires is sufficient evidence to permit, not to compel, but to permit the inference that the San Carlos Apache Tribe would not be harmed by these applications. Freeport met that burden in terms of water quantity at all times under the existing condition and the proposed condition. Freeport's rights are always junior to the tribe's, and we have a call system administered by an officer of the court at any time the San Carlos Apache Tribe places its call. It must receive the full allocation of its call before Freeport receives a drop. That's true whether Freeport is irrigating the proposed place or the prior existing place of use. So why should there be a duty to call? Doesn't the mere construction of diversions in and of itself create the problem? Well, Freeport has a right and entitlement under the decree to irrigate the acreage in the upper valleys. The question is, does it injure the tribe because you're irrigating one parcel versus another? And the answer is no, even if you assume that there's some small change in return flows. And that's sort of the argument as well. If you're irrigating here and then you move it to this location, there's no question Freeport has a right to irrigate these acreages. Anything else would be a collateral attack on the decree, and this Court has found that. This is not an issue about does resumption of irrigation harm the tribe. That's a collateral attack on the decree. Freeport has the right to irrigate its decreed acres. The question is, does irrigating in place A versus place B harm the tribe? And where did Judge Bolton go wrong? Where Judge Bolton went wrong, and she, by the way, she got that right that that's a collateral attack on the decree to say we're injured because you hadn't been irrigating and now you want to start irrigating again. That's not a valid objection. Where Judge Bolton got it wrong, from our perspective, respectfully, is the district court held Freeport to something more stringent than initial crime of pasture burden. Freeport came forward with all of the legal protections afforded to the tribe in the form of the decree, the priority system, the call system, the water quality injunction, and all of those things demonstrate that the likelihood of the tribe being injured is very small. Now, that's not the end of the story. The tribe gets to put on evidence that it's actually being harmed. When that burden actually did shift, the San Carlos Apache tribe put on injury experts from Stetson Engineers. Stetson Engineers was paid $400,000 in connection with the trial court proceedings, could not generate one opinion of actual specific harm with respect to any of these applications. And if that level of consulting work was in the context of an actual harm situation, you would have had opinions about this application is causing X and this application is causing Y. Counselor, I'm alerting you to the fact that you've only got five minutes left, and I think your co-counsel would like to. And I'm committed to yielding to him unless there's any further questions at this time. Thank you all. Appreciate it, Counselor. Just as a matter of clarification, the five minutes includes the rebuttal time, does it not? Did we start with 25 minutes? I think we did. Oh, did we start with 25 minutes? Yes, we did. We did. I was getting anxious. I guess we're going to go for 30. All right. Thank you very much. It's probably a worthwhile investment of time because these are very complex issues, and we understand that. And I didn't notice either, so that's fine. That's fine. Counsel, if you may proceed. Good morning. May it please the Court, my name is Paul Eckstein. I would bear it on behalf of the Franklin Irrigation District, the Gila Valley Irrigation District, and farmers in the upper Gila Valley. I'm alerted to the fact that you might tell us about jurisdiction. Yes, and I think it really starts with and maybe ends with the Concha v. London case, the 1993 Ninth Circuit case, which looked at whether voluntary withdrawals with an order from the court under Rule 41 created jurisdiction. And the court said it did not. If it was an involuntary dismissal or if it was a voluntary dismissal with prejudice, it made a difference. But these are voluntary dismissals without prejudice. My clients have had 360 applications for severance and transfer. They were all voluntarily withdrawn. So under the law of the Ninth Circuit in Concha v. London, which the community doesn't respond to and which the federal parties give the back of their hand, there's no jurisdiction. I don't think there's any serious question about that. I suppose we could grant them, grant their motion to treat the opening brief as an amicus brief. Would that make sense? Well, whether to treat our brief as an amicus brief or a brief of the party doesn't really matter. The same arguments are made. But we don't have jurisdiction with respect to those. Now, what about the segregation of the applications into a subset of the district court? As I understand it, there was no Rule 54 certification made. They were segregated, but they weren't joined with the subset. So the subset, 10 of those were tried, 10 applications were tried. Do we have a finality with respect to those? Yes, you do. I mean, I think you absolutely do because those were not voluntarily withdrawn without prejudice. So there are a number of ways in which you can handle it and decide that, sever off the 360. The federal parties in the community recognize that this isn't going to be binding. Whatever decision you make won't be binding on the factual issues, what the community says. It goes without saying, this is in the context of their abandonment claim discussion, that this court's judgment, therefore, will be limited to three-parts applications. So there's been doubt that because they were voluntarily withdrawn, it can't be part of this case. It's not appealable. I want to say two things following up on forfeiture, and they're both in our briefs. Number one, in our brief and in the Salt River Project brief, attention was called to Article 17, Section 2 of the Arizona Constitution, which has not been interpreted, but it does say, all existing rights to the use of any of the waters of the state for all useful or beneficial purposes are hereby recognized and confirmed. And the argument is, as we set out in our brief, that there's a constitutional protection, indeed, to the Manne Spring and other protection. Finally, there is a set procedure for forfeiture under Arizona law. It's in 45-189, and it sets out in great detail who has the power to make a forfeiture. And that power is visited with the director of the Department of Water Resources. He's the one who has that power. A judge sitting in this case has the power to determine all other issues with respect to severance and transfers, but not whether there has been a forfeiture. It's an elaborate procedure. The parties talk about the various subparts of 189 and how they apply and how they don't apply. I don't think you can pick and choose. 189 is a law that sets out a detailed procedure that hasn't been followed in this case. Thank you very much. Thank you, Counsel. We'll hear from the other side. May it please the Court, John Smeltzer for the United States. I will be sharing time with Counsel for the San Carlos Apache Tribe, and we'll be taking five minutes. Counsel for the Gila River Indian Community, we'll be taking ten minutes. And I'd like to start with five minutes of the opening argument and five minutes of rebuttal. Counsel, let me just ask, as between Mr. Sparks and Mr. Shaw, which are the clients that they're representing? Mr. Sparks with the San Carlos Apache Tribe, Mr. Shaw with the community. Can you remind me again the allocation of time between the community and the tribe? Five for the tribe, ten for the community. Very well. Thank you. Your Honor, let me start with the question of abandonment or forfeiture. That's where I want to start the discussion, and I want to begin with the San Carlos Apache Tribe case because we do believe it is the more important precedent for this Court, in fact, the only precedent that it is controlling. And I want to draw the Court's attention to the opinion, a quote from the opinion at 972 Pacific 2nd, page 193, where the Court quotes from a prior decision of the Arizona Supreme Court. And the Court says, quote, when an amendment, and they're talking about the 1995 Act now, when an amendment is enacted after a considerable length of time and constitutes a clear and distinct change of the operative language, it is an indication of an intent to change rather than clarify the previous statute. Counsel, can you give us the site again? It's 972 Pacific 2nd, what page? 193, Your Honor. 193, thank you. And there the Court is acknowledging the Arizona Supreme Court that there is a fundamental difference in the language of the 1995 Act, which purported to provide a clear exemption to pre-1919 water rights from the operation of the rule of forfeiture, versus the language of the 1919 Savings Clause, which did not. And the Court is recognizing, and as it did, it declared, you know, the prior, or the 1995 Act unconstitutional because it would change the law, because there were rights that could have been forfeited in the interim, because the original 1919 Savings Clause did not make rights pre-Act, pre-1919 rights, immune from the purely prospective application of the rule of forfeiture. And so, you know, we believe St. Carlos controls on that point. But even if this Court determines, as Mr. Hood argued, that St. Carlos doesn't control, certainly Mance-Spring does not control the Court's determination of the issue either. Mance-Spring did interpret a similar statute, but Mance-Spring interpreted Nevada law, and all of this Court's precedents in the Alpine case and the Oreditch case were simply following the Nevada Supreme Court's analysis of Nevada law, as this Court was required to do. None of that meant, or means, that this Court is then required to follow Alpine and Oreditch in its application of the Arizona statute. And as we explained in detail in our brief, the fundamental error that the Nevada Supreme Court made, if you're trying to take that precedent and apply it to Arizona law, was to presume that there was a fundamental change in the law at the point that the forfeiture statute was codified. As we explained in our brief, pre-existing Arizona law was dependent on the principle of beneficial use and notion of reasonable diligence, and use or lose was already part of the pre-existing Arizona law. It was already featured in case decisions with respect to adverse use. There was already a pre-existing statute, the 1893 statute, which codified this in part with respect to the time between hosting and the use of the law. And so there was already the pre-existing duty of due diligence, and other state courts have recognized that where there's a pre-existing duty of due diligence, when a legislature then codifies that duty of due diligence in a forfeiture provision, that is simply codifying a pre-existing requirement of the law, and it is not an impairment of a vested right because there was no expectation pre-existing at the time. So is this an issue that we should certify to the Arizona Supreme Court? San Carlos has already decided, Your Honor. So the question then is simply interpreting San Carlos. Interpreting San Carlos, and then in the context of the additional explanation that we provide, this is an issue that this court is fully able to interpret and determine in the context of its jurisdiction over the federal rights that he would decree. Unless there are further questions on forfeiture, I'm going to defer to Mr. Sparks. You're very welcome. May it please the Court. My name is Joe Sparks with the San Carlos Apache Tribe. I have five minutes to discuss why, in our opinion, and the Court should affirm the trial court's decision on the issue of the requirement to prove no harm to other right holders under the decree when someone has to amend the decree by changing their description of the decree under the decree. As you know, the decree sets out in minute detail the elements of the decree, and there is but one way to amend the decree, and that's under Article 11, which appears at page 112 of the decree. The lessons of Article 11, it says that a party may change the place, manner, and type of use, providing that party can prove to the Court that it will do no injury to the rights of others under the decree. The procedural rule 90 was adopted in 1993 to provide a due process and uniform process by which applications to amend the decree could be considered. And in that rule, the Court repeated on an adoption in Part 4.4b the duty on the applicant's part to provide a private agency proof, evidence, that it would not do injury to the rights of others if they... Counsel, under the terms of the decree, is it correct to state that Article 11 puts the burden on the moving party, that is, the party that wishes to change the decree to satisfy the obligation of no harm? Yes. Are you asking me, is that correct? Is that correct, yes. Yes, that is correct. And the... So when we look at Judge Bolton's analysis, we should understand it in terms that she understood that in this case Freeport had the burden approved to show that there was no harm. Yes, and so... Counsel? It is Judge Bolton's assumption, and the procedural rule adopted for the applications and changing rule, use rule, also assumes the burden is on the applicant. I mean, it's a rule of equity. If a party wants to change the rules, it must show both factually that it will not injure others, and the equitable result is required under the decree. And therefore... Isn't there a burden, Counsel? I'm sorry? A prima facie case? Judge Gould? Judge Gould's asking you a question, Counsel? Yes. Isn't there a burden? It's not a video, Counsel. A prima facie case? My understanding... My understanding of the question, Judge, is that the factual... You know, if I step away just a little bit from the mic, I think it's... That's fine. That's fine. My understanding is that the factual evidence is the burden is on the applicant to provide factual evidence to show how the river will function differently after the application is granted and that that functional difference in the river will not harm or injure the rights of another. And that's exactly what the rule says. And in the applications, the judge understood that and went minutely into each of the applications, every line of the applications, to determine whether Freeport had provided the court with any evidence that it could use to analyze whether or not the function of the river would change to injure the rights to others. And in the trial of the matter, she also went through all of the evidence provided in the trial of the evidence to determine whether or not Freeport had provided any evidence that would fulfill the initial obligation to provide a prime and fancy fact showing that there would be no injury to the others. Therefore, finding that there was none, no individual information about each application and its functional effect on the river, then she must deny and did deny each of those. She went then to the cumulative injury issue and said, where there's multiple applications filed at once, it is only reasonable and equitable that all of the cumulative effect of those applications be considered. And it would render the rule of Article 11, the only one that allows amendment of the decree, meaningless if the applicant did not file that application and there was no basis for the fact finding by the court. My time is up, Your Honor, and thank you for your service to the court. Thank you, Counsel. Mr. Shaw. May it please the Court, Pradeep Shaw for the Gila River Indian Community. I'd like to start off by addressing forfeiture, which I think from Gila's perspective is the big ticket item. Your Honor, Mr. Hood stated the law of retroactivity to you and said that the Arizona Supreme Court, in the San Carlos decision, did not reach the critical question of whether the 1995 amendment created a change in the law. But that is impossible under the law of retroactivity because a necessary predicate to finding a law retroactive, unconstitutionally retroactive, is that it would have affected a change, a substantive change would have created a new rule to the law. I'd like to point you to three excerpts in the opinion in particular that make this point irrefutable. So I'd start with page 190 of the decision, and there the Arizona Supreme Court says, and I'll quote it for you at page 190, it says, Page 190 of which decision? The San Carlos Apache. The Arizona Supreme Court decision, page 190. It says, if applied retrospectively, this, and this is the 1995 amendment, quote, creates a new and unconstitutional protection for pre-1919 water rights. If it created a new protection, that means the preexisting regime did not provide this perpetual protection for pre-1919 water rights. So it is a necessary predicate for the statement that the 1995 amendment, which would provide the exact same insulating effect that they say has always existed under the code, what the Arizona Supreme Court said is that 1995 amendment, which would create that insulating effect, was a new protection. That's verbatim at page 190. So that was necessarily decided. You cannot say they didn't reach the issue. They clearly reached the issue and decided it. If that were not enough, if you look at the prior page in 199, 189, when the Arizona Supreme Court describes what is the law of retroactivity, it looks to the Supreme Court's precedent, the U.S. Supreme Court's precedent in Lansgraf, and it quotes, it says, and I'll quote from 189, a statute may not attach, quote, new legal consequences to events completed before its enactment, citing Lansgraf, and that's of course the Supreme Court law on retroactivity. It is only unconstitutionally retroactive and imposes a new legal consequence. The Arizona Supreme Court in the next sentence says, in other words, legislation may not disturb vested substantive rights by retroactively changing the law that applies to completed events. So it says the only way you have an unconstitutionally retroactive enactment is if it changes the law, and then on the next page, which I just read a moment ago, it says it changed the law. It created a new legal consequence, and if that were not enough to show that the Arizona Supreme Court decided the question, then on page 194 of the same decision, it says these are not mere clarifications. It said it's more akin to a change in the law, not a clarification. So we have three places in the Arizona Supreme Court opinion which it makes clear. The 1995 amendment, which would accomplish the exact same definition that they said has always been a part of the Arizona Water Code, was a new protection and a change to the preexisting law. That is the only way they could have struck it down as unconstitutionally retroactive. There is no ambiguity here. The decision is clear and controlling. This Court has to follow the Arizona Supreme Court's decision. The one point I—oh, I'm sorry, Your Honor. Is your position identical to the U.S. position? Your Honor, ours is, although we focus exclusively on San Carlos Apache because we decide that the U.S. also points to the preexisting history, which buttresses that, but we would just stop at San Carlos Apache because for the reasons that I explained, it conclusively decides this question. And here is where Judge Bolton went wrong is, I think, in the understanding of the retroactivity law. And it's the same mistake Mr. Hood, I think, made here. The Arizona Supreme Court got it right. We have to assume that they got the law of retroactivity right, which is to say it has to be a change in the law to be unconstitutionally retroactive. What Judge Bolton and the other side say is, oh, we don't need to decide whether it's a mere clarification or a change in the law. That's what Judge Bolton said when she was the district court judge— or the trial court judge in San Carlos Apache. She said the same thing in the opinion in this case. But we know from all the passage that I just read that the Arizona Supreme Court, following the U.S. Supreme Court's decision in Landgraf, got retroactivity correct. You can't strike something down as unconstitutionally retroactive unless it changes the legal rule. And the Arizona Supreme Court spells that out. It's exactly correct. This is a new protection, and therefore it could not have been the case that the day before the 1995 amendment was enacted, that the Arizona law already perpetually protected for any right, any pre-1919 right from forfeiture, even for five years of nonuse that happened decades after the forfeiture statute was enacted. And so we think San Carlos Apache conclusively decides the forfeiture issue and that there's no occasion for this court to look to the Nevada Supreme Court's decision in Mansi Spring. Obviously, that's a different state's law. They can interpret their state's law however they want to. All that the Ninth Circuit, all that this court was doing in Orewater Ditch, in Judge Fletcher's opinion and in the Alpine cases, was applying that Nevada Supreme Court decision, which is from 1940. And so, of course, when you're looking to Nevada law, you apply Mansi Spring. But when you're looking to Arizona law, you apply San Carlos Apache. And so we think it's plain, it's clear, and it compels the result in this case. Now, the other thing I would just note is if you rule on forfeiture, that San Carlos Apache does not forever adopt our rule and not their rule, that it forever insulates pre-1919 water rights, then you don't have to reach any of the abandonment issues. Abandonment is necessarily subsumed through the identical claims, and there's no factual dispute of five years of non-use here. And so it turns completely on that pure question of law, what the Arizona Supreme Court decided. And that would end our entire appeal because we only raised two issues, forfeiture and abandonment. And so once you decide that, you don't have to get to any of the other issues. With the remaining two minutes, I'm happy to discuss any of the other issues that this Court had otherwise. I'll sit down on jurisdiction. I would just note that I don't think there's any dispute among the parties that at least some subset of the claims are properly before this Court, and that's all you need to do to decide the forfeiture issue because the forfeiture cuts across all the Freeport applications, and I don't think anyone is disputing that the Freeport applications are properly before this Court. We think they're all properly before this Court. What about those that were withdrawn? Your Honor, the ones that are withdrawn are not before this Court because they were withdrawn, but the forfeiture counterclaims cut across every single one. So as long as forfeiture isn't one of those applications, you can decide the issue. And even if forfeiture weren't, the one distinction I would draw, and maybe it will help clear up some confusion, forfeiture and abandonment were counterclaims, so even with respect to applications that were withdrawn, the counterclaims still survive. And so the district court ruled on some of the counterclaims, and even if some of those applications were subsequently withdrawn, that doesn't moot the counterclaim. But the non-Freeport applicants are not proper parties. We don't think they're proper parties, as we noted in our reply brief, because they don't have any applications that were, they were all withdrawn. They were all dismissed, so we're not quite sure why they're here. They simply were not part of any of the orders in front of this Court. But all we're asking for is a legal ruling on forfeiture, which would obviously be the first. We need not be concerned about the lack of 54B certification. No, Your Honor. This Court's decision in the United States v. Washington is conclusive on that, that in the context, unlike a normal case when you have these post-judgment proceedings, these consent decrees that span 70, 80 years in which there are always ongoing post-judgment proceedings, in that context, 450B is not required as long as the subset of cases are complete. Very well. Thank you. Mr. Smeltzer, your side still has five additional minutes. You can either use them now or expand your rebuttal. What's your preference? Rebuttal. Rebuttal? Very well. All right, we'll have the first rebuttal by Mr. Hood. And you have five minutes, Mr. Hood. Thank you, Your Honor. And please, the Court, Sean Hood again on behalf of Freeport Minerals. Good afternoon again, Judge Gould. Obviously, the focus here is forfeiture. And what's going to be critical for this Court's determination is a very careful read of San Carlos, what it decided and what it did not. You heard from Mr. Shaw and you heard from Mr. Smeltzer quoting the language, new protection. Well, there was a new protection added. There was new language grafted onto the existing forfeiture statute that did not exist before the 1995 amendments. Now, the legal effect of that language probably does nothing over and above what the Savings Clause already did, but that was a new set of language that was not already existing. That is all the Court's now shown. Excuse me. What about Mr. Shaw's argument that that changed the legal rule? Well, it probably doesn't change the legal rule. The language probably doesn't do anything over and above what the Savings Clause already did. What it did was add new language. And that's all the Court did was say, is this retroactively applied? Is it new language, a new protection? Then it's a due process violation. Go through, I would request that the Court take a look at each of these proposed amendments and ask yourself, is the Court actually evaluating, is this a change in existing law? The other thing they talk about is this issue about clarification and that this is more of a change rather than a clarification. Pay close attention to that portion of the San Carlos decision. That is in response to Judge Bolton's ruling below. And I would also direct the Court directly, footnote 6, paragraph, I'm sorry, page 8 of the Gila River Indian Community's response and reply brief. There's a link to Judge Bolton's ruling below. It sets the stage for all of this. What you see is Judge Bolton was asked to rule that these new amendments would provide some guidance in terms of interpreting ambiguous law. Is this really, is the preexisting law the same and these new amendments are merely clarifying the law? The Arizona Supreme Court, while it affirmed Judge Bolton in most respects, this is an area where the Arizona Supreme Court reversed Judge Bolton. Not saying each and every one of these is a change in law, but saying when you have a legislature some 80 years later. The analogy, the Arizona Supreme Court reversed Judge Bolton. On that one point. Judge Bolton's ruling was, it may be when a specific case of controversy is presented to me and I'm asked to say, are these 1995 amendments, are they relevant for me to analyze ambiguous law and understand what the legislature meant by previous law? She said, we'll look at that as potentially helping me to construe these provisions. When we get to the question about is it a change in the law, the Arizona Supreme Court reversed on that point saying, we're not going to jump to the falsehood of assuming that today's legislature has any idea what was intended by the legislature in 1919. And so that was the ruling there. There was no finding that these were changes as opposed to clarifications. The point was, if the legislature is acting now, that doesn't tell us anything about what the law was 80 years ago, 100 years ago. And again, Judge Bolton, this is set out in more detail in Judge Bolton's trial court order in the special action. So I encourage the court to pay particular attention to that. I also want to note, Mr. Schmelzer referenced the consolidation that occurred in the Arizona Water Code in 1928. And one of the savings clause was eliminated. Well, that was eliminated for redundancy. And I want to make perfectly clear that this point is not lost. The general savings clause covering the entirety of the code remained in place throughout the entirety of Arizona's water district. And the Arizona Supreme Court has ruled time and again that change in 1928 was intended to consolidate and eliminate superfluous provisions, not to affect any substantive change in the law. So I want to make that point very, very clear. Mr. Schmelzer, as he did in his briefs, he tries to equate the concept of beneficial use with somehow providing forfeiture under Arizona law. And those concepts are simply not the same. They're both water law concepts, but the concept of beneficial use does not provide a basis for forfeiture of a water right. All of the cases that we cite over and over again, CLOUGH is the preeminent case. Arizona law did not include forfeiture until 1919. That is abundantly clear. I'm coming down to the line here. Mr. Sparks, I want to clarify a question about the prima facie burden. And I want to be clear. Freeport did have the initial prima facie burden under the change in use rule. And we don't have any problem with that. Again, the fundamental question, and I think this goes to a couple of the questions that were posed to Mr. Sparks, is going through the decree, the protections afforded to the tribe, the water quality injunction, the call system, the testimony of the water commissioner, was that sufficient to meet that initial prima facie burden, to permit, not to compel, but to permit the inference that the tribe would not be harmed? That's all Freeport was obligated to do as a prima facie matter, and then the burden was supposed to shift. So if anybody has a final question, I'd love to answer it. Otherwise, I'm out of time. Thank you. Appreciate it, counsel. Mr. Spelser, your side has ten minutes. Thank you, Your Honor. Let me start again with the issue of forfeiture and the question of the St. Carlos, whether it controls or not. We agree with the arguments that Mr. Shaw made, that it is a definitive statement. It should be deemed controlling. But if this Court finds, as Mr. Hood had said, that it isn't controlling, you don't default then to the law of Nevada. And that's a critical point. We explained in great detail in our brief what the pre-1919 law of Arizona was. And we explained that the principle of beneficial use and the notion of forfeiture go hand in glove because what the pre-existing law is, is a right, it's just a usurpatory right of use. Water rights are not possessed in the same way as real property rights or personal property rights. It's essentially a grant from the state that you may use water with priority, as long as there's beneficial use of that water. So the beneficial use is a condition on the basis of the measure, and it's the limit of all aspects of using a water right. So there's no expectation in that context that if you stop using, then you're going to maintain your place in law. And that's what the other state supreme courts have held when looking at new forfeiture statutes. We cite in our brief the Hagerman case out of New Mexico, the case out of the Texas Supreme Court, the Texas Water Commission, where they essentially said, look, within the concept of beneficial use is this principle of due diligence. And that what the legislature is doing when they're converting or codifying a rule of forfeiture is simply codifying that use or lose principle that is fundamental to water rights. And let me be clear what's at stake here. What Freeport is saying is that, well, they have decreed water rights for each of their applications, for each of their quarter-quarter parcels that exceed, that are greater than the amount of irrigable acreage within those areas. So they can't use that water on those parcels where the decreed rights were upheld. And there's no dispute over it. They haven't used it, and they can't use it, and they say they have no duty of due diligence in order to make those parcels capable of allowing that water to be used there again. I mean, in some of these cases, they were rendered non-irrigable by the placement of roads or the placement of canals, the building of structures, and in some instances by the movement of the river. But what Freeport has said is, look, we don't have any obligation to exercise any due diligence in making those areas of the parcel usable again in order that we can use our water right. We can just hang on to this water right ad infinitum. And the problem with that is, is although junior users are able to use the water that Freeport is not using, no junior user can use that water with any security of right. And that's why it's contrary to the concept of beneficial use. If there are essentially people that are ready, willing, and able to beneficially use the water, and Freeport's saying, well, we can just have this right that we can then use at any time in the future, which will interfere with your use, that's just simply contrary to the concept of beneficial use. And in addition to that, as we pointed out in our brief, prior to 1919, there is no state provision that requires a permit or any pre-application in order to go in and assert or to take water, to appropriate water. So any user prior to 1919 always has to look over his or her shoulder at somebody else that's going to try to take that unclaimed water. And so when you look at the 1919 statute and whether it did, per the savings clause, impair the pre-existing rights, you have to look at the 1919 Water Code as a whole and all of the protections that are provided for water users. You know, they no longer have to look over their shoulder at anybody just coming in and using the water that they're not using because the Water Code requires there to be a permit and a process for the commissioner to determine whether this water is appropriate. So it's a change in law, sure, and a clarification, but it's not an impairment of a pre-existing right because there is no pre-existing expectation that you can maintain your place in law and your priority if you just stop using without any exercise of diligence. If there are no questions on the issue of forfeiture, I'd like to speak briefly to the question of whether Freeport met its burden in showing a prima facie showing of no injury to other users. And the place I want to start is with the standard. The counsel says it only needs to show as it permits the inference. Do you agree with that? Permits the inference of no injury. Well, you heard your counsel. It's an argument. Well, he's trying to make a lesser burden out of this private fishing case. But where I want to first orient the court is that the burden and the standard is to make a prima facie case of no injury to other users, all users on the system, not just the senior user and not just the ones that show up and object. And the reason that requirement is in the law, because if you change the place of a usable water, right, say you have an irrigation, right, that gives you 100 acre feet of water. If you take that and you're using that 100 acre feet of water next to the river for irrigation, some of that water is going to come back to the river in the form of return flows. So hypothetically, let's say you have a right to divert 100 acres, apply it to particular land near the river, and 30 acre feet come back to the river. So then your actual diminution in terms of what you're taking from the river, as per downstream users, is only 70. Okay. So if you change the place of that use, if you pump that water up over a ridge or you put it someplace further away from the river so you don't have that return flow anymore, what you're doing is making a greater impact on the river because you're still taking the 100 out, but if nothing's coming back, the downstream users no longer have the benefit of that 30 acre feet of return flow. So that's the fundamental reason. Do you keep track of that 30 acre feet return flow, or is that just hypothetically? That's part of the privatization burden on them, because what happens in terms of acquiring water rights in the river, all the junior users have acquired water rights based on the upstream uses. And so they have a right, because your water right is a part in a particular part of the river, the junior users have a right to expect, and in fact all downstream users have a right to expect, that the senior place of use is going to operate the same way, and it's going to have the same effect on the river, and therefore they know what's in the river. So you don't have to account for that even though they may get more. I'm sorry? Even though there may be more water if you're saying that they only use 70 of their 100. What I'm saying is if they've always used 100 in a particular place, 30 has always flowed back to the river. Right. That is what the other users on the river have gained their water rights based on, that 30 coming back to the river. So they're counting on what would otherwise be called an additional 30? They're counting on it because the water right is appurtenant to that particular land. I see. Right? So it's a water right that's appurtenant, and it's a water right to use it on that parcel, but the ultimate effect of that water right, with that seniority and that priority, is to take only 70 out of the river and to leave 30. And that's why there is a burden of the test to show a primatization case is to show you're not changing, ultimately, the flows in the river and the water quality. And what Freeport did in its applications, right, on this question of primatization burden, all they said is, well, we're not changing the dates and the priorities of our water rights. That shows nothing. That says nothing about whether you're impacting the flows in the river in a way that might impact something. It goes without saying. You cannot transfer more water than you already have, and you can't get a greater priority when you move your water. They completely abdicated on their obligation in their applications. And then when you get to court and when you get to the appeal here, all Freeport is saying now is, well, the tribe is the most senior user on this part of the river, and therefore they can make a call, and there's a water quality injunction that can help protect them. But, again, that doesn't meet the burden with respect to all water users. And the district court looked closely at this and determined it didn't even show a primatization case of no injury to the tribe because of the unique circumstances of these transfer applications. And because of the history of this river, which has shown that the ability to make a call by the tribe has not protected their rights. And the water quality injunction, of course, only applies after there has been injury and only applies to water users in the Safford Valley, and it doesn't even apply to folks in the Duncan-Verdon Valley. And some of these transfer applications sort of move from the Safford up to the Duncan-Verdon. Long story short, the district court took a careful look at all of the issues that could come up. Freeport never made an effort to make a showing to meet the primatization burden. I see my time is up, Your Honors. Thank you, Counsel. Thank you all, Counsel, for helping us with this very complicated case. We appreciate your work very, very much, and we will go to work on trying to sort all this out. Thank you. The case just argued will be submitted for decision, and the court will adjourn. Thank you.
judges: O'scannlain, Gould, M. Smith